UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

FILED

2019 JAN 18 P 2:53

U.S. DISTRICT COURT
NEW HAVEN, CT.

IN RE: Request from the Republic of Poland
Pursuant to the Treaty Between the
Government of the United States of
America and the Government of
Poland on Mutual Assistance in
Criminal Matters in the Matter of
████████████

No. 3:19mc11 (RMS)
(Under Seal)

——————————————————— /

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ORDER

The United States is seeking an order appointing a person as a commissioner to collect evidence requested by the Republic of Poland in its attached treaty request (the "Request") made pursuant to the Agreement Between the United States of America and the Republic of Poland on the Application of the Treaty Between the United States of America and the Republic of Poland on Mutual Legal Assistance in Criminal Matters signed 10 July 1996, and pursuant to Article 3(2) of the Agreement on Mutual Legal Assistance Between the United States of America and the European Union signed at Washington 25 June 2003, U.S.-Poland, June 9, 2006, S. TREATY DOC. NO. 109-13 (2006) (the "Treaty") and to seek other orders, as needed, to execute the Request as authorized by the Treaty and 18 U.S.C. § 3512.

The Central Authority for the Republic of Poland pursuant Article 3(2) of the Treaty, makes this Request in connection with a criminal investigation. Specifically, the investigating and prosecuting authority are investigating the 1990 sexual assault and homicide of an 18-year-old victim named ████████ The Request asks United States authorities to obtain two DNA samples from, and conduct and interview of, ████████████ who was identified as a

3512 MLA APP; LLP 2009 DEC

former sexual and romantic partner of the victim.  The DNA samples will be compared against the DNA profile of semen recovered from the victim's vagina after her body was discovered.

Federal courts, pursuant to the Treaty, statute and their inherent authority, may issue orders as may be necessary for the production of the evidence requested by the Republic of Poland, including orders appointing a person as a commissioner to gather such evidence and establishing the procedures for the production of such evidence.

A.      Authority to Execute the Request

1.      The Treaty

A treaty constitutes the law of the land.  U.S. Const. art. VI.  The provisions of a treaty have equal footing with acts of Congress and are binding on the courts.  Asakura v. City of Seattle, Washington, 265 U.S. 332, 341 (1924); United States v. The Peggy, 5 U.S. 103 (1801); In re Commissioner's Subpoenas, 325 F.3d 1287, 1291 (11th Cir. 2003).  To the extent that the provisions of a treaty are inconsistent with a preexisting statutory provision, the treaty supersedes the statute.  Zschernig, et al. v. Miller, Administrator, et al., 389 U.S. 429, 440-441 (1968); In re Commissioner's Subpoenas, 325 F.3d 1287, 1305-1306 (11th Cir. 2003); United States v. Erato, 2 F.3d 11, 15-16 (2d Cir. 1993).

The United States and the Republic of Poland entered into the Treaty in order to "improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance in criminal matters."  Preamble to the Treaty.  In accordance with the provisions of the Treaty, each state is obliged to provide assistance to the other in taking the testimony or statements of persons, providing documents, records, and articles of evidence, locating or identifying persons or items, serving documents, transferring persons in custody for testimony or

other purposes, executing requests for searches and seizures, assisting in proceedings related to

immobilization and forfeiture of assets, restitution to the victims of crime, collections of fines,

and any other form of assistance not prohibited by the laws of the Requested State.  Treaty, Art.

1; In re Commissioner's Subpoenas, 325 F.3d 1287, 1290 (11th Cir. 2003).  Each state

contemplated that it would provide the other with assistance generally comparable to that which

is available to its own law enforcement authorities, which assistance includes the items noted

above. Barr v. U. S. Department of Justice, 645 F. Supp. 235, 237 (E.D.N.Y. 1986), aff'd, 819

F.2d 25 (2d Cir. 1987).

     The Treaty and 18 U.S.C. § 3512 empower federal courts to execute treaty requests in

order to comply with the United States' treaty obligations.  Article 5 of the Treaty provides that:

"The judicial or other competent authorities of the Requested State shall issue subpoenas, search

warrants, or other orders necessary to execute the request."  The Treaty contemplates that federal

courts will use compulsory measures to execute such requests.

     The Treaty imposes no dual criminality requirement as a precondition for providing

assistance.  Consequently, each state party is obligated to provide assistance without regard to

whether the conduct under investigation or prosecution would constitute an offense under the

laws of the Requested State, except as otherwise provided by U.S. law.  The Treaty provides that

a request for legal assistance may be denied if it relates to a military offense that would not be a

crime under ordinary criminal law, or if the request relates to a political offense.  See Article

3(1).

     2.    Statutory Authority Grounding Execution of Requests for Assistance

     The Treaty is designed to be self-executing and requires no implementing legislation.

See Letter of Submittal of Treaty from the Department of State to the President, dated June 18,

1997; In re Commissioner's Subpoenas, 325 F.3d at 1291. However, because the procedural provisions in many treaties are minimal, in the past federal courts routinely utilized procedures authorized by 28 U.S.C. § 1782 (the "commissioner" process) to execute treaty requests from foreign authorities. In re Commissioner's Subpoenas, 325 F.3d at 1305-1306 (11th Cir. 2003). Substantive U.S. law regarding searches, seizures and other compulsory processes further grounded the execution of such assistance requests.

On October 19, 2009, the President signed the Foreign Evidence Request Efficiency Act of 2009 (Public Law 111-79), enacting 18 U.S.C. § 3512, the full text of which is attached for the convenience of this Court. Section 3512 explicitly authorizes a federal court to:

> issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing, and restitution.

Section 3512 directly empowers the federal courts to execute such requests and separately codifies under Title 18 the longstanding practice and procedures employed by the United States and the federal courts to execute requests by foreign authorities for assistance to the fullest extent possible under U.S. law. Congress enacted Section 3512 to make it "easier for the United States to respond to these requests by allowing them to be centralized and by putting the process for handling them within a clear statutory scheme." 155 CONG. REC. S6,810 (2009) (Statement of Sen. Whitehouse).

B.    Execution of Foreign Requests for Assistance Under the Treaty and Section 3512.

    1.    Authorization of the Application to This Court

Section 3512 provides:

Upon application, duly authorized by an appropriate official of the Department of Justice, of an Attorney for the Government, a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation

and prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing and restitution.

For purposes of Section 3512, an application is "duly authorized by an appropriate official of the Department of Justice" when the Department of Justice, Criminal Division, Office of International Affairs, has reviewed and authorized the request and is executing the request itself or has delegated the execution to another attorney for the government. In this matter, such authorization and delegation is evidenced by a letter dated December 17, 2018, from the Department of Justice, Criminal Division, Office of International Affairs, received by the United States Attorney, transmitting the Request to this district for execution.

Section 3512(c) authorizes filing the instant application in this district, where the witness/evidence is believed to be located.

2.  Foreign Authority Seeking Assistance Within Section 3512 and the Treaty.

As to the "foreign authority" making the Request, Section 3512(h) provides:

The term "foreign authority" means a foreign judicial authority, a foreign authority responsible for the investigation or prosecution of criminal offenses or for proceedings related to the prosecution of criminal offenses, or an authority designated as a competent authority or central authority for the purpose of making requests for assistance pursuant to an agreement or treaty with the United States regarding assistance in criminal matters.

In this matter the Foreign Judicial Cooperation Section, 1st Investigation Division of the Circuit Prosecutor's Office in Poznań is the designated Central Authority in the Republic of Poland for requests made pursuant to the Treaty.

As evidenced by the Request itself and confirmed in the authorization process and again by the undersigned, consistent with Section 3512(a)(1), the foreign authority seeks assistance in the investigation or prosecution of criminal offenses or in proceedings related to the prosecution of criminal offenses.

3512 MLA APP; LLP 2009 DEC

3.    Authority of the Federal Courts Under Section 3512.

When enacting Section 3512, Congress intended that federal courts facilitate to the fullest extent possible the execution of requests by foreign authorities for assistance in criminal matters and endeavored to streamline and expedite the execution of such requests.  Section 3512 authorizes federal courts to issue "such orders as may be necessary to execute a request" and specifically includes:  orders for search warrants pursuant to Federal Rule of Criminal Procedure 41; orders for stored wire or electronic communications and related evidence under 18 U.S.C. § 2703; orders for pen registers and trap and trace devices under 18 U.S.C. § 3123; orders for the provision of testimony or a statement or the production of documents or other things, or both; and orders appointing "a person" to direct the taking of testimony or statements or the production of documents or other things, or both.   18 U.S.C. § 3512(a)(1), (2).

The assistance requested by the Republic of Poland pursuant to the Treaty in the instant Request falls squarely within that contemplated by both the Treaty and Section 3512.

C.    Appointment of a Person as Commissioner to Collect Evidence

1.    Statutory Authorization.

Section 3512(b) provides that a federal judge may "issue an order appointing a person to direct the taking of testimony or statements or of the production of documents or other things, or both."  The statute further authorizes the person appointed to issue orders requiring the appearance of a person, or the production of documents or other things, or both; administer any necessary oath; and take testimony or statements and receive documents or other things.

Commensurate with past practice under 28 U.S.C. § 1782, it is anticipated that a federal court would appoint an attorney for the government, typically a federal prosecutor, as "commissioner."

2.      <u>Procedures for Evidence Collection</u>

Section 3512 (a) specifically empowers a federal judge to issue "such orders as may be necessary" to execute the request.  This authorization encompasses orders specifying the procedures to be used to collect particular evidence, including procedures requested by the foreign authority to facilitate its later use of the evidence.  In executing a request made pursuant to a treaty, a court has the obligation to prescribe effective and expeditious procedures designed to promote the purpose of the treaty.  <u>See In re Commissioner's Subpoenas,</u> 325 F.3d at 1305.  Nothing in Section 3512 suggests any limitation on a court's power to exercise "complete discretion in prescribing the procedure to be followed" as was available under 28 U.S.C. § 1782. <u>In re Letter of Request from the Crown Prosecution Service of the United Kingdom</u>, 870 F.2d 686, 693 (D.C. Cir. 1989), citing 1964 U.S.C.C.A.N. at 3789.  <u>See  White v. National Football League, et al.</u>, 41 F.3d 402, 409 (8th Cir. 1994), <u>cert</u>. <u>denied</u>, 515 U.S. 1137 (1995) (a court may issue whatever process it deems necessary to facilitate disposition of a matter before it); FED.R.CRIM.P. 57(b).

    a.      <u>Procedures Authorized by Other Statutes</u>.

In addition, Section 3512 references specific U.S. laws for obtaining certain evidence and, by doing so, adopts any statutorily mandated procedures in relation to obtaining orders for search warrants; orders for contents of stored wire or electronic communications or for records related thereto; and orders for a pen register or a trap and trace device.

    b.      <u>Orders by the Person Appointed; Commissioner Subpoenas</u>

Section 3512 authorizes the "person" appointed (here, and in past practice under 28 U.S.C. § 1782, the "commissioner") to issue orders "requiring the appearance of a person, or the

production of documents or other things or both." Further, Article 5 of the Treaty provides for

the issuance of procedural documents, such as subpoenas, to gather evidence.

If a federal district court so orders, the commissioner may use the attached form, still

entitled "commissioner's subpoena," to obtain the requested evidence. See In re:

Commissioner's Subpoenas, 325 F.3d 1287, 1291 (2d Cir. 1993) (incorporating in pertinent part

a district court's order directing use of commissioner's subpoenas); United States v. Erato, 2 F.3d

11, 13-14 (2d Cir. 1993) (same). This commissioner's subpoena is simply a version of the

"order" to be issued by the person appointed by the court under Section 3512 to direct the

production of evidence. Section 3512 expressly authorizes the service and enforcement of such

orders, or commissioner's subpoenas, anywhere in the United States (i.e., coextensive with the

service of subpoenas in U.S. criminal investigations and prosecutions).

    c.    <u>Notice of Evidence Taking</u>

As an initial matter, this application is being made <u>ex parte</u>, consistent with U.S. practice

in its domestic criminal matters and its prior practice on behalf of foreign authorities under 28

U.S.C. § 1782. <u>In re Letter of Request from the Crown Prosecution Service of the United</u>

<u>Kingdom</u>, 870 F.2d 686, 688 (D.C. Cir. 1989); <u>In re Letters Rogatory from the Tokyo District,</u>

<u>Tokyo, Japan</u>, 539 F.2d 1216, 1219 (9th Cir. 1976). The Treaty itself contemplates the need for

confidentiality with respect to all aspects of the execution of requests. <u>See</u> Treaty, Article 5(5).

Both Section 3512 and the Treaty at Article 5 authorize use of compulsory process in the

execution of treaty requests comparable or similar to that used in domestic criminal

investigations or prosecutions. Because subpoenas utilized in U.S. criminal proceedings (i.e.,

grand jury and criminal trial subpoenas) are issued without notice to any party other than the

recipients (i.e., no notice to targets or defendants), orders and commissioner's subpoenas issued

in execution of treaty requests pursuant to Section 3512 and the applicable treaty likewise should require no notice other than to the recipients.  In the absence of a specific request to provide notice, a district court and U.S. authorities can assume that a requesting foreign authority has provided such notice as the foreign law requires, or that foreign law does not require notice and the requesting foreign authority does not consider notice to be necessary or useful.  Accordingly, a federal district court should authorize a commissioner to collect the evidence requested without notice to any party other than the recipient of the commissioner's subpoena except to the extent that a request asks for specific notice procedures.

Conclusion

 The instant Request is exactly the type of request contemplated for execution under Section 3512.  In its sequential legislative efforts relevant to the provision of assistance to foreign authorities, Congress has intended that the United States set an example to other nations by making judicial assistance generously available. See, e.g. In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago, 848 F.2d 1151, 1153-1154 (11th Cir. 1988), cert. denied, 488 U.S. 1005 (1989).  Section 3512 enables the United States to respond "more quickly . . . to foreign evidence requests.  These efforts will assist [the United States] with [its] investigations as foreign authorities will be urged to respond in kind to our evidence requests in a speedy manner."  155 CONG. REC. H10,093 (2009)(Statement of Rep. Schiff).

As to this Request, both the investigatory nature of the Request as described and the intentions of the foreign authority under the Treaty militate that the application and order be maintained under seal.

Accordingly, to execute this Request, the Government moves this Court to issue the attached order pursuant to the Treaty and 18 U.S.C. § 3512 appointing the undersigned Assistant

3512 MLA APP; LLP 2009 DEC

U.S. Attorney as commissioner, authorizing the undersigned to take the actions necessary, including the issuance of commissioner's subpoenas, to obtain the evidence requested, to adopt such procedures in receipt of the evidence as are consistent with the intended use thereof, and sealing the application and order until further order of this Court.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/ *Sara. Nyl*

SARALA V. NAGALA
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. phv05529
157 CHURCH STREET, 25TH FLOOR
NEW HAVEN, CT 06510
(203) 821-3700
Sarala.Nagala@usdoj.gov

3512 MLA APP; LLP 2009 DEC

Certified translation from the Polish language

*State emblem of the Republic of Poland*
THE CIRCUIT PROSECUTOR'S OFFICE IN POZNAŃ
**1ST INVESTIGATION DIVISION**
**Foreign Judicial Co-operation Section**
ul. Solna 10
61-736 POZNAŃ
phone: +48 618852022, fax: +48 618852093
e-mail: oz@poznan.po.gov.pl  a.skrzypczak@poznan.po.gov.pl

PO I Oz.r.401.2017.Pp

Poznań, 22 November 2017

## REQUEST FOR JUDICIAL ASSISTANCE
## IN THE CRIMINAL MATTER

The Criminal Investigation Department of the Voivodeship Police Headquarters in Poznań is conducting activities in cases involving unsolved major crimes. Among the cases, there is an investigation of the District Prosecutor's Office in Leszno, reference number: Ds. 619/91), into the murder of ▇▇▇▇▇▇ The District Prosecutor's Office is overseeing activities relating to the finally discontinued investigation, and aiming at tracking down a perpetrator who murdered ▇▇▇▇▇▇ whose corpse was found in the forest near the road between Leszno and Boszkowo on 4 July 1990, i.e. into the crime under Article 148, paragraph 1 of the Penal Code.

The investigation revealed the following facts of the case: on 4 July 1990, the Police at Święciechowa were notified by Mieczysław Jankowski of a corpse of a young female found in the forest. The corpse was lying approximately 500 metres off a car park in Święciechowa, adjacent to the forest, near the road between Leszno and Włoszakowice. Operational and procedural steps were promptly taken and established that the corpse belonged to 18-year-old ▇▇▇▇▇▇ residing in Wschowa, who left her home on 2 July 1990, at about 9:00 p.m., with the intention of hitchhiking to Leszno, and disappeared since then. Examination of the location, in which the corpse was found, revealed traces of dragging the corpse, such as disrupted forest floor and the victim's socks and shoes scattered around. The corpse was fully dressed in underwear, trousers and a blouse, and clothes did not bear any trace of mechanical damage. During examination, 3 hair pieces on the blouse and 3 hair pieces on panties were revealed and secured. The victim had a visible, deep, bloody would on her right inner elbow; however, no tool used to inflict that wound was found. An autopsy revealed that the cause of death had been suffocation caused by choking, and that the wound on the inner elbow had been inflicted after death as confirmed by relative little blood on the corpse despite the fact that veins had been cut. Inside of the deceased victim's vagina and anus, semen of a human

male was found and secured. Moreover, it was established that the deceased victim's was 3-4 weeks pregnant. Conclusions from the examination and autopsy show that, shortly before death, ▮▮▮▮▮▮ had two sexual intercourses. Biological material from the corpse was secured and used to obtain a genetic profile of a potential perpetrator.

The activities performed in the case resulted in a finding that ▮▮▮▮▮▮ then-boyfriend ▮▮▮▮▮▮ may be associated with the crime. Performed in 1990, the activities involving a legal guardian and stepmother of ▮▮▮▮▮▮ indicated a very far-reaching emotional relationship between ▮▮▮▮▮▮ and the deceased victim. According to the witness, after violent death of ▮▮▮▮▮▮ was behaving in an irrational way, and, while agitated, said that "...at last *[she]* will no longer blackmail anyone".

Performed in 1990, the activities did not lead to any examination of ▮▮▮▮▮▮ who left for his wife to the United States of America shortly after the incident and settled in New Britain, 80 miles away from New York. His wife, ▮▮▮▮▮▮ used to live in Dębowa Łęka. They have two children of the marriage: ▮▮▮▮▮▮ born in 1992 and ▮▮▮▮ born in 1994 or 1996. According to the findings, ▮▮▮▮▮▮ owned a yacht on the lake at Boszkowo, where the victim was a frequent visitor; also on that tragic day, the victim was coming back home from her stay on the lake.

According to the testimony provided by one of the witnesses, ▮▮▮▮▮▮ has been absent from Poland for approximately 30 days. His sister, ▮▮▮▮▮▮ dwells permanently in Germany. Except for his sister ▮▮▮▮▮▮ has no sister or brother, i.e. sister of ▮▮▮▮▮▮ was living in Leszno, married to ▮▮▮ of Leszno. Then they divorced and she got married again to a German national to whom she is still married.

In 1990, ▮▮▮▮▮▮ was living in Leszno with a person whose current personal details are as follows: ▮▮▮▮▮▮ resident of Kotlina, ul. Poznańska 10A. ▮▮▮▮ has been staying in Nuremburg, Germany, for long time now.

As part of current activities, ▮▮▮▮▮▮ has been contacted by phone several times and invited for a meeting in Poznań or Leszno, Poland, for the purpose of examining her as a witness, and sampling reference material for genetic testing. We already had the meeting scheduled but ▮▮▮▮▮▮ never showed up. She explained by phone that she had contacted her brother and, after their conversation, they had reached the conclusion that the case is old, so she could see any need for her participation in the case, not to mention her consent to DNA-comparing testing.

Ultimately, the German party was requested to perform judicial activities with ▮▮▮▮▮▮ under the request for international judicial assistance. Examined as a witness, ▮▮▮▮▮▮ refused to testify and did not agree to give any reference material for DNA biological testing.

In this case, there have been many judicial and extrajudicial activities performed, which, however, have not led to determining the perpetrator of the crime. One of the threads, which have not been clarified yet, is acquaintanceship of victim ▮▮▮▮▮▮ with ▮▮▮▮ ▮▮▮▮▮▮ i.e. the boyfriend she was meeting with.

Among the investigative steps, there have been activities aiming at determining a link, if any, between ▮▮▮▮▮▮▮▮▮▮ and death of ▮▮▮▮▮▮▮▮▮▮ The activities have been performed based on a material sample taken from ▮▮▮▮▮▮▮▮▮▮ who is an aunt of ▮▮▮▮ ▮▮▮▮▮▮▮▮ i.e. a sister of his father. According to the experts' findings presented in Supplement No. 10 to Test Report No. DR 95/12 of 29 April 2016, the material is insufficient to issue a firm opinion. The only possible way to fully resolve this issue is through active and direct participation of ▮▮▮▮▮▮▮▮▮▮

Therefore, given the content of the evidentiary material gathered, and in order to make it possible for the prosecutor conducting the case to clarify circumstances of the case, which are essential to the investigation, and to make a right substantive decision, <u>I hereby kindly ask you to:</u>

I. Examine the following person as a witness: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ son of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ born on ▮▮▮▮▮▮▮▮ in Leszno, holder of the following Personal Identification Number (PESEL): 71022806811, resident at the following address: ▮▮▮▮▮▮▮▮ New Britain, CT 06051. Please, cause the witness to answer the following questions:

1. When was the witness in Leszno, Wschowa, Niechłów and Szlichtyngowa?
2. What does the witness do at present; what did the witness do in 1990; with whom is the witness living at the witness's current address, with whom was the witness living in 1990; does the witness have his family members or acquaintances in the above-mentioned towns? (Please specify who those people are, where they live, and when the witness visited them )
3. Does the witness have a car, and if so, what car is it, and what car did the witness have in 1990?
4. Did the witness or any of his acquaintances have a Fiat 126p, Fiat 125, Polonez or Volkswagen Golf (if so, please specify the car model, body colour, damages)?
5. Where is the witness living at present, since when has the witness been living there, and where was the witness living in 1990?
6. Why did the witness leave Poland and where did the witness go to?
7. When did the witness come to visit Poland after the witness' departure from Poland?
8. Where does the witness' wife come from; do the witness and his wife have children?
9. Where was the witness studying or working in 1990; did the witness have a car or motorcycle?
10. What kind of relations did the witness have with ▮▮▮▮▮▮▮▮▮▮
11. Did the witness attend a funeral of ▮▮▮▮▮▮▮▮▮▮
12. How was the witness behaving before and after death of ▮▮▮▮▮▮▮▮▮▮
13. What is the witness' hobby?
14. What does the witness do at present and what does the witness live off?
15. Since when did the witness know ▮▮▮▮▮▮▮▮ what kind of acquaintanceship was it, were the witness and ▮▮▮▮▮▮▮▮ friends?

16. Was ▮▮▮▮▮▮ confiding in the witness; was she telling the witness about her male acquaintances; whom of her acquaintances was she mentioning; with whom was ▮▮▮▮▮▮ meeting?

17. What does the witness know about death of ▮▮▮▮▮▮

18. Were the witness and ▮▮▮▮▮▮ hitchhiking or using taxis together?

19. Who does the witness think might want ▮▮▮▮▮▮ dead?

20. Was ▮▮▮▮▮▮ provoking the incident through her behaviour?

II.     At the same time, please collect a material reference sample from the witness, for DNA biological testing, by taking a mouth swab and collecting hair strands along with bulbs.

Before starting examining the witness, please advise the witness on the following provisions as indicated below:

1) Article 233, paragraph 1 of the Penal Code, reading as follows:
   "Whoever, in giving testimony which is to serve as evidence in court proceedings or other proceedings conducted on the basis of a law, gives false testimony or conceals the truth shall be subject to the penalty of deprivation of liberty for a term of 6 months to 8 years.";

2) Article 233, paragraph 1a of the Penal Code, reading as follows:
   "If a perpetrator of an act specified in paragraph 1 gives false testimony or conceals the truth through fear of criminal liability threatening himself or his next of kin, shall be subject to the penalty of deprivation of liberty for a term of 3 months to 5 years.";

3) Article 183, paragraph 1 of the Code of Criminal Procedure, reading as follows:
   "A witness may decline to answer a question, if such an answer might expose the witness himself or his next of kin to criminal liability for an offence or a contravention of the taxation law."

Pursuant to Article 143, paragraph 1, item 2 of the Code of Criminal Procedure, a written report of the examination of the witness is required. At the same time, pursuant to Article 191, paragraph 1 of the Code of Criminal Procedure, the examination shall begin by the witness being asked his name and surname, age, occupation, his criminal record for giving false testimony or for making false accusation, and whether he is related, and how, to the parties.

   Please, cause the witness to sign a statement and a copy of a letter of rights and obligations of witnesses in criminal proceedings, attached hereto; please do not enter the address details of a witness into the witness examination report but use such details to complete an appendix to a witness examination report, attached hereto. Please return one copy of each of the documents above to us. Please, attach photocopies of documents submitted by the witness in support of his testimony, to the witness examination report.

At the same time, we assure you that the aforesaid judicial activities requested hereunder are permitted by Polish law. Moreover, please be assured that data obtained through the requested activities will not be used for the purpose of any other proceedings whatsoever without the consent of the Requested Party.

*Deputy Circuit Prosecutor*
*Mikołaj Gajewicz*
*/-/ illegible signature*

*Round stamp with the state emblem of the Republic of Poland, and the following text on the rim:* The Circuit Prosecutor's Office in Poznań.*10*

Attachments:
- statement (2 copies)
- letter of rights and obligations of witnesses in criminal proceedings (2 copies)

*Oblong stamp:*
> CIRCUIT PROSECUTOR'S OFFICE
> IN POZNAŃ          (1)
> 1ˢᵗ INVESTIGATIVE DIVISION
> Foreign Relations Section
> 61-736 Poznań, Solna 10

**Excerpt from the regulations of the Penal Code - Act of June 6, 1997**

**(Journal of Laws of August 2, 1997 Number 88, item 554 as amended)**

### Article 148 Section 1 of the Penal Code

Anyone who kills a person is liable to a penalty of imprisonment for a period not shorter than 8 years, the penalty of 25 years' imprisonment or life imprisonment.

### Article 101, Section 1 of the Penal Code

An offence may not be prosecuted upon the expiration of the following periods from the time of its perpetration:

1. 30 years – if the act is a felony of homicide;
2. 20 years – if the act is another felony;
2a. 15 years – if the act is an offense amenable to a penalty of imprisonment exceeding 5 years,
3. 10 years – if the act is an offense amenable to a penalty of imprisonment exceeding 3 years;
4. 5 years – in case of other offenses

### Article 102 of the Penal Code

If proceedings are initiated against a person within the period provided for by article 101, then the offence specified in article 101 paragraph 1 committed by the person ceases to be punishable with the lapse of 10 years, and in other cases – with the lapse of 5 years from the end of such a period.

> *Oblong stamp:*
> For conformity
> 27.11.2017
> *(-) illegible signature*
> Natalia Kędzia

*Round official stamp with the national emblem of the Republic of Poland in the centre and the following inscription on the rim: "Circuit Prosecutor's Office in Poznań * 10 *."*



*Oblong stamp:*

CIRCUIT PROSECUTOR'S OFFICE
IN POZNAŃ          (1)
1st INVESTIGATIVE DIVISION
Foreign Relations Section
61-736 Poznań, Solna 10

## STATEMENT

I hereby state that I have learned the content of the following regulations:

1) Article 233, § 1 of the Penal Code, which reads:
"Any person who, while giving testimony which is going to serve as evidence in court proceedings or other proceedings being conducted on the basis of a law, gives false evidence or withholds the truth is liable to imprisonment for a period of 6 months up to 8 years."

2) Article 233, § 1a of the Penal Code, which reads:
"If the perpetrator of a deed specified in §1 gives false evidence or withholds the truth because of fear of his/her own criminal responsibility or of criminal responsibility of the members of their family, he/she shall be liable to imprisonment for a period of 3 months up to 5 years."

3) Article 183, § 1 of the Code of Penal Procedure, which reads:
"A witness may decline to answer a question, if such answer might expose the witness themselves or their next of kin to criminal liability for an offence or tax offence."

Place and date: _____

Signature: _____

*Round official stamp with the national emblem of the Republic of Poland in the centre and the following inscription on the rim: "Circuit Prosecutor's Office in Poznań * 10 *."*

*Repertory No. 2393/2017*
*I, the undersigned, Ryszard Pruszkowski, sworn translator of the English language entered on the list of sworn translators of the Minister of Justice, hereby certify that the above text is a true and complete translation of the original Polish document.*
*Warsaw, December 8, 2017*

PROKURATURA OKRĘGOWA
Wydział Śledczy
Dział Obs...
ul. Solna 10

**III. POUCZENIE O UPRAWNIENIACH I OBOWIĄZKACH ŚWIADKA W POSTĘPOWANIU KARNYM**

**III. GUIDANCE ON THE RIGHTS AND OBLIGATIONS OF A WITNESS IN CRIMINAL PROCEEDINGS**

*Source J.L. 2016, item 515*

A witness in criminal proceedings shall have the following rights:

1. Any person summoned to be a witness is obliged to appear and testify (art. 177 para. 1). Should the case be urgent, a person can be summoned to be a witness by telephone or other means of communication (art. 137). Should a summoned person be unable to appear in court due to illness they need to present a medical certificate issued by a court-appointed physician. A certificate issued by a GP or other medical professional shall be deemed insufficient (art. 117 para. 2a). A witness is entitled to reimbursement of travel costs (art. 618a-618e). All unexcused absences may result in a fine, custody or arrest (art. 285-287).

2. Under exceptional circumstances, a witness videoconference may be arranged (art. 177 para. 1 and art. 390 para. 3).

3. Should there be a valid reason for which a witness is unable to appear in court, including illness, they may testify at their place of residence (art. 177 para. 1a and 2).

4. Should the mental state or intellectual development of a witness be in question they may be asked to testify in the presence of a court-appointed medical expert or psychologist (art. 192 para. 2). A medical examination may be arranged with the witness's consent (art. 192 § 4); witness fingerprints, buccal swabs, hair, saliva and smell samples can be taken without consent, as well as handwriting specimen, a photograph and a voice recording (art. 192a § 1).

5. Confidential and classified information can only be testified provided a witness has been relieved of the obligation of secrecy by an authorized supervisor (art. 179 para. 1). A witness shall have the right to refuse to testify any proprietary or confidential information as well as professional secrecy, unless they have been released from the obligation of secrecy by the court or the prosecutor (art. 180 para. 1). A hearing which would include sharing information classified as notary, barrister, legal counsel, tax advisor, medical, journalistic or statistical secrecy may be only arranged when unavoidable and the circumstances cannot be determined on the basis of other evidence (art. 180 para. 2). The release of a journalist from the obligation of secrecy shall not include the identification of the author of a press release, letter to the editor or other similar material, nor identification of people who have their personal data reserved, with the exception of the crimes for which denunciation is obligatory (art. 180 para. 3 and 4). In these cases, the court shall hear a witness at the non-public trial (art. 181 para. 1).

6. The next of kin of the defendant, including a spouse, parent, child or a partner, shall have the right to refuse to testify. A witness charged with complicity in the crime in another case under investigation shall also have the right to refuse to testify (art. 182 para. 1 and 3). A witness may exercise their right to refuse to testify until the commencement of the first testimony given in court proceedings. Any previously testimony, given under these circumstances, may not be used as evidence (art. 186 para. 1).

---

[1] The provisions in brackets indicate the articles of the Act of 6 June of 1997, Code of Criminal Procedure (Journal of Laws, item 555, as amended), unless stated otherwise

7. A witness may refuse to answer a question should the answer expose them or their next of kin to criminal liability (art. 183 para. 1). A witness who is in a particularly close personal relationship with the defendant may be exempt from testifying or answering a question (art. 185). A witness may request for the hearing to be non-public if the content of the testimony could result in a witness or their next of kin's embarrassment (art. 183 para. 2).

8. A witness under the age of 15, in the case of an offence committed with the use of violence or a threat, a sex offence or an offence against the family or who is a victim of crime against freedom, shall testify only once in an appropriately adapted child-friendly setting. The hearing shall be recorded. Alternatively, a videoconference can be arranged. Additional hearings shall only be organised under exceptional circumstances (art. 185a, art. 185b and art. 185d).

9. Witnesses of rape or other sexual abuse shall testify in court; should they verbally notify the prosecutor or police officer of the offense, only the most important facts and evidence shall be testified (art. 185c para. 1). The hearing in the court shall be recorded and should not be repeated. Should additional hearings be necessary, at the request of a victim a videoconference might be arranged (art. 185c para. 2 and 3).

10. Personal details, including the place of residence and place of work of a witness shall not be disclosed in the case file. They shall be published in a separate annex available only to the authority conducting the proceedings and revealed only under exceptional circumstances (art. 148a). Should the life, health, freedom or significant property of a witness or their next of kin be threatened, the identity of the witness shall also be kept confidential (art. 184, the so-called anonymous witness).

11. Should the life or health of a witness or their next of kin be threatened, they may obtain Police protection for the duration of the proceedings. Should the level of risk be considered high, they may obtain personal protection or support in arranging a new place of residence. The request for protection shall be addressed to the Provincial Police Commander through the authority conducting the proceedings or the court (art. 1-17 of the Act of 28 November 2014 on victim and witness protection and support (Journal of Laws 2015, Item 21)).

12. A witness and their next of kin are entitled to free legal and psychological support through the Criminal Victims Support Network (art. 43 para. 8 point 2a of the Act of 6 June 1997, Executive Penal Code (Journal of Laws, item. 557, as amended).

I confirm that I received guidance

(date, signature)



¹⁾ The provisions in brackets indicate the articles of the Act of 6 June of 1997, Code of Criminal Procedure (Journal of Laws, item 555, as amended), unless stated otherwise

United States Code    Effective: October 19, 2009
Title 18. Crimes and Criminal Procedure
Part II. Criminal Procedure
Chapter 223. Witnesses and Evidence
§ 3512. Foreign requests for assistance in criminal investigations and prosecutions

(a) Execution of request for assistance.--

(1) In general.--Upon application, duly authorized by an appropriate official of the Department of Justice, of an Attorney for the Government, a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing, and restitution.

(2) Scope of orders.--Any order issued by a Federal judge pursuant to paragraph (1) may include the issuance of--

(A) a search warrant, as provided under Rule 41 of the Federal Rules of Criminal Procedure;

(B) a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703 of this title;

(C) an order for a pen register or trap and trace device as provided under section 3123 of this title; or

(D) an order requiring the appearance of a person for the purpose of providing testimony or a statement, or requiring the production of documents or other things, or both.

(b) Appointment of persons to take testimony or statements.--

(1) In general.--In response to an application for execution of a request from a foreign authority as described under subsection (a), a Federal judge may also issue an order appointing a person to direct the taking of testimony or statements or of the production of documents or other things, or both.

(2) Authority of appointed person.--Any person appointed under an order issued pursuant to paragraph (1) may--

(A) issue orders requiring the appearance of a person, or the production of documents or other things, or both;

(B) administer any necessary oath; and

(C) take testimony or statements and receive documents or other things.

(c) Filing of requests.--Except as provided under subsection (d), an application for execution of a request from a foreign authority under this section may be filed--

(1) in the district in which a person who may be required to appear resides or is located or in which the documents or things to be produced are located;

(2) in cases in which the request seeks the appearance of persons or production of documents or things that may be located in multiple districts, in any one of the districts in which such a person, documents, or things may be located; or

(3) in any case, the district in which a related Federal criminal investigation or prosecution is being conducted, or in the District of Columbia.

(d) Search warrant limitation.--An application for execution of a request for a search warrant from a foreign authority under this section, other than an application for a warrant issued as provided under section 2703 of this title, shall be filed in the district in which the place or person to be searched is located.

(e) Search warrant standard.--A Federal judge may issue a search warrant under this section only if the foreign offense for which the evidence is sought involves conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law.

(f) Service of order or warrant.--Except as provided under subsection (d), an order or warrant issued pursuant to this section may be served or executed in any place in the United States.

(g) Rule of construction.--Nothing in this section shall be construed to preclude any foreign authority or an interested person from obtaining assistance in a criminal investigation or prosecution pursuant to section 1782 of title 28, United States Code.

(h) Definitions.--As used in this section, the following definitions shall apply:

(1) Federal judge.--The terms "Federal judge" and "Attorney for the Government" have the meaning given such terms for the purposes of the Federal Rules of Criminal Procedure.

(2) Foreign authority.--The term "foreign authority" means a foreign judicial authority, a foreign authority responsible for the investigation or prosecution of criminal offenses or for proceedings related to the prosecution of criminal offenses, or an authority designated as a competent authority or central authority for the purpose of making requests for assistance pursuant to an agreement or treaty with the United States regarding assistance in criminal matters.

(Added Pub.L. 111-79, § 2(4), Oct. 19, 2009, 123 Stat. 2087.)
18 U.S.C.A. § 3512, 18 USCA § 3512
Current through P.L. 111-86 (excluding P.L. 111-84) approved 10-29-09

| 105TH CONGRESS<br>*1st Session* | SENATE | TREATY DOC.<br>105–12 |
|---|---|---|

# MUTUAL LEGAL ASSISTANCE TREATY
## WITH POLAND

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE
GOVERNMENT OF THE REPUBLIC OF POLAND ON MUTUAL
LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED AT WASH-
INGTON ON JULY 10, 1996



JULY 8, 1997.—Treaty was read the first time and, together with the
accompanying papers, referred to the Committee on Foreign Relations
and ordered to be printed for the use of the Senate

---

U.S. GOVERNMENT PRINTING OFFICE

39–118                    WASHINGTON : 1997

# LETTER OF TRANSMITTAL

---

THE WHITE HOUSE, *July 8, 1997.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Between the United States of America and the Republic of Poland on Mutual Legal Assistance in Criminal Matters, signed at Washington on July 10, 1996. I transmit also, for the information of the Senate, the report of the Department of State with respect to the Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter criminal activity more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of crimes, including "white-collar" crime and drug trafficking offenses. The Treaty is self-executing.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes: taking of testimony or statements of persons; providing documents, records, and articles of evidence; serving documents; locating or identifying persons or items; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to immobilization and forfeiture of assets, restitution to the victims of crime, and collection of fines; and any other form of assistance not prohibited by the laws of the Requested State.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

## LETTER OF SUBMITTAL

———————

DEPARTMENT OF STATE,
*Washington, June 18, 1997.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty Between the United States of America and the Republic of Poland on Mutual Legal Assistance in Criminal Matters ("the Treaty"), signed at Washington on July 10, 1996. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with a number of other countries.

The Treaty with Poland contains all essential provisions sought by the United States and, indeed, follows closely the form and content of mutual legal assistance treaties recently concluded by the United States. It will enhance our ability to investigate and prosecute a variety of offenses, including white collar crime and drug trafficking offenses of particular interest to the U.S. law enforcement community with respect to Poland. The Treaty is designed to be self-executing and will not require implementing legislation.

Article 1 sets forth a non-exclusive list of the major types of assistance to be provided under the Treaty, including taking the testimony or statements of persons; providing documents, records and articles of evidence; serving documents; locating or identifying persons or items; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to immobilization and forfeiture of assets, restitution to the victims of crime and collection of fines; and rendering any other form of assistance not prohibited by the laws of the Requested State. The scope of the Treaty includes not only criminal offenses, but also proceedings directly related to criminal matters, which may be civil or administrative in nature.

Article 1 states that assistance shall be provided without regard to whether the conduct involved would constitute an offense under the laws of the Requested State.

Article 1(4) states explicitly that the Treaty is not intended to create rights in private parties to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

Article 2 provides for the establishment of Central Authorities and defines Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or a person designated by the Attorney General. For Poland, the Central Authority is the Minister of Justice—Attorney General or

(V)

a person designated by the Minister of Justice—Attorney General. The article provides that the Central Authorities shall communicate directly with one another for the purposes of the Treaty.

Article 3(1) sets forth the limited circumstances under which a Requested State's Central Authority may deny assistance under the Treaty. A request may be denied if it relates to a military offense that would not be a crime under ordinary criminal law, or if the request relates to a political offense. In addition, a request may be denied if its execution would prejudice the security or similar essential interests of the Requested State, or if it is not made in conformity with the Treaty.

Before denying assistance, the Central Authority of the Requested State is required under Article 3(2) to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions as the Central Authority of the Requested State deems necessary. If the Requesting State accepts assistance subject to these conditions, it is required to comply with the conditions. If the Central Authority of the Requested State denies assistance, it is required under Article 3(3) to inform the Central Authority of the Requesting State of the reasons for the denial.

Article 4 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each request. The article permits other forms of request in emergency situations but requires written confirmation within ten days thereafter unless the Central Authority of the Requested State agrees otherwise. Unless otherwise agreed, the request shall be in the language of the Requested State.

Article 5 requires the Central Authority of the Requested State to execute the request promptly or to transmit it to the authority having jurisdiction to do so. It provides that the competent authorities of the Requested State shall do everything in their power to execute a request, and that the judicial or other competent authorities of the Requested State shall have authority to issue subpoenas or other orders necessary to execute the request. The Central Authority of the Requested State must make all arrangements for and meet the costs of representation of the Requesting State in any proceedings arising out of an assistance request.

Under Article 5(3), requests are to be executed in accordance with the laws of the Requested State except to the extent that the Treaty provides otherwise. However, the method of execution specified in the request is to be followed except insofar as it is prohibited by the laws of the Requested State. If the Central Authority of the Requested State determines that execution of the request would interfere with an ongoing investigation, prosecution, or proceeding, it may postpone execution or, after consulting with the Central Authority of the Requesting State, impose conditions on execution. If the Requesting State accepts assistance subject to conditions, it shall comply with them.

Article 5(5) further requires the Requested State, if so requested, to use its best efforts to keep confidential a request and its contents, and to inform the Requesting State's Central Authority if the request cannot be executed without breaching confidentiality. This provides the Requesting State an opportunity to decide whether to

VII

pursue the request or to withdraw it in order to maintain confidentiality.

Article 5 additionally requires the Requested State's Central Authority to respond to reasonable inquiries by the Requesting State's Central Authority regarding the status of the execution of a particular request; to report promptly to the Requesting State's Central Authority the outcome of its execution; and, if the request is delayed or postponed, to inform the Requesting State's Central Authority of the reasons for the delay or postponement.

Article 6 apportions between the two States the costs incurred in executing a request. It provides that the Requested State shall pay all costs, except for the following items to be paid by the Requesting State: fees of expert witnesses, costs of translation and interpretation, the costs of recording by private parties of testimony or statements (or the costs of preparation by private parties of written records or videotapes of testimony or statements), and allowances and expenses related to travel of persons pursuant to Articles 10 and 11.

Article 7 requires the Requesting State to comply with any request by the Central Authority of the Requested State that information or evidence obtained under the Treaty not be used for proceedings other than those described in the request without its prior consent. Further, if the Requested State's Central Authority asks that information or evidence furnished be kept confidential or be used in accordance with specified conditions, the Requesting State must use its best efforts to comply with the conditions. Once information is made public in the Requesting State in accordance with either of these provisions, no further limitations on use apply. Nothing in the article prevents the use or disclosure of information to the extent that such information is exculpatory to a defendant in a criminal prosecution. The Requesting State is obliged to notify the Requested State in advance of any such proposed disclosure.

Article 8 provides that a person in the Requested State from whom testimony or evidence is requested pursuant to the Treaty shall be compelled, if necessary, to appear and testify or produce items and articles of evidence. The article requires the Central Authority of the Requested State, upon request, to furnish information in advance about the date and place of the taking of testimony or evidence.

Article 8(3) further requires the Requested State to permit the presence of persons specified in the request (such as the accused, counsel for the accused, or other interested persons) and to permit them to question the person giving the testimony or evidence. In the event that a person whose testimony or evidence is being taken asserts a right to decline to provide testimony or evidence under the laws of the Requesting State, Article 8(4) provides that the testimony or evidence shall be taken and the claim made known to the Central Authority of the Requesting State for resolution by its authorities.

Finally, in order to ensure admissibility in evidence in the Requesting State, Article 8(5) provides, through the use of Forms A and B appended to the Treaty, a mechanism for authenticating evidence that is produced pursuant to or that is the subject of testi-

VIII

mony taken in the Requested State (or certifying its absence or nonexistence).

Article 9 requires that the Requested State provide the Requesting State with copies of publicly available records in the possession of an executive, legislative or judicial authority in the Requested State. The Requested State may further provide copies of records or information that are in the possession of an executive, legislative or judicial authority in that State, but not publicly available, to the extent and under the same conditions as it would provide them to its own law enforcement or judicial authorities. The Requested State has the discretion to deny such requests pursuant to this paragraph entirely or in part. Article 9 also provides that no further authentication shall be necessary for admissibility into evidence in the Requesting State of official records where the official in charge of maintaining them authenticates the records through the use of Form C appended to the Treaty. In like manner, the absence or nonexistence of such records is, upon request, to be certified by the use of Form D, which shall be admissible in evidence in the Requesting State.

Article 10(1) provides a mechanism for the Requesting State to invite the voluntary appearance in its territory of a person located in the Requesting State. The Requested State shall indicate the extent to which the expenses will be paid. Article 10(2) states that a person appearing in the Requesting State shall not be prosecuted, detained or subjected to any restriction of personal liberty by reason of any acts or convictions that preceded that person's departure from the Requested State. Under Article 10(3), any safe conduct provided for by this article ceases fifteen days from the date when the person's presence is no longer required, and that person, having had an opportunity to leave, has remained in the Requesting State or, if the person has left the Requesting State and voluntarily returns to it.

Article 11 provides for temporary transfer of a person in custody in the Requested State to the Requesting State for purposes of assistance under the Treaty (for example, a witness incarcerated in the Requested State may be transferred to the Requesting State to have his deposition taken in the presence of the defendant), provided that the person in question and the Central Authorities of both States agree. The article also provides for voluntary transfer of a person in the custody of the Requesting State to the Requested State for purposes of assistance under the Treaty (for example, a defendant in the Requesting State may be transferred for purposes of attending a witness deposition in the Requested State), if the person consents and if the Central Authorities of both States agree.

Article 11(3) further establishes both the express authority and the obligation of the receiving State to maintain the person transferred in custody unless otherwise authorized by the sending State. The return of the person transferred is subject to terms and conditions agreed to by the Central Authorities, and the sending State is not required to initiate extradition proceedings for return of the person transferred. The person transferred receives credit for time served in the custody of the receiving State.

Case 1:19-cr-00010-RMS SEALED Document 12-2 Filed 08/01/18 Page 30 of 46

Article 12 requires the Requested State to use its best efforts to ascertain the location or identity of persons or items specified in a request.

Article 13 obligates the Requested State to use its best efforts to effect service of any document relating, in whole or in part, to a request under the Treaty. A request for the service of a document requiring a person to appear in the Requesting State must be transmitted a reasonable time before the scheduled appearance. Proof of service is to be provided in the manner specified in the request.

Article 14 obligates the Requested State to execute requests for search, seizure and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State. It provides that, upon request by the Central Authority of the Requesting State, every official who has custody of a seized item is required to certify, through the use of Form E appended to the Treaty, the continuity of custody, the identity of the item and the integrity of its condition. No further certification is required. The certificate is admissible in evidence in the Requesting State. Article 14(3) further provides that the Central Authority of the Requested State may impose terms and conditions deemed necessary to protect third party interests in items to be transferred.

Article 15 requires the Requesting State's Central Authority, upon request of its counterpart in the Requested State, to return documents, records or articles of evidence obtained in the execution of a request as soon as possible.

Article 16(1) provides that, if the Central Authority of one Contracting Party becomes aware of proceeds or instrumentalities of offenses that are located in the other Contracting Party and may be forfeitable or at least subject to immobilization under the laws of the other Party, it may so inform the Central Authority of that other Party. If the Party receiving such information has jurisdiction, it may present this information to its authorities for a determination whether any action is appropriate. The Central Authority of the Party receiving such information is required to inform the Central Authority that provided the information of the action taken.

Article 16(2) also obligates the Contracting Parties to assist each other to the extent permitted by their respective laws in proceedings relating to forfeiture of proceeds and instrumentalities of offenses, restitution to victims of crime and collection of fines imposed as sentences in criminal prosecutions. Under Article 16(3), the Party having custody over proceeds or instrumentalities of offenses is required to dispose of them in accordance with its laws. Either party may share with the other party forfeited assets, or the proceeds of their sale, to the extent not prohibited by the transferring party's laws and upon such terms as it deems appropriate.

Article 17 states that assistance and procedures provided in the Treaty shall not prevent either Contracting Party from granting assistance through the provisions of other applicable international agreements or pursuant to established practices consistent with their laws.

X

Article 18 provides that the Central Authorities shall consult, at times mutually agreed to promote the most effective use of the Treaty, and may agree upon such practical measures as may be necessary to facilitate the Treaty's implementation.

Article 19 provides that the Contracting Parties shall exchange instruments of ratification at Warsaw, and the Treaty shall enter into force 30 days after the exchange of instruments of ratification. Article 19 further provides that either party may terminate the Treaty by written notice of the other party, with termination to become effective six months after the date of receipt of such notice.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegations consisting of representatives from the Department of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate as soon as possible.

Respectfully submitted,

MADELEINE ALBRIGHT.

TREATY BETWEEN

THE UNITED STATES OF AMERICA

AND

THE REPUBLIC OF POLAND

ON

MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

2

The United States of America and the Republic of Poland;

Desiring to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance in criminal matters,

Have agreed as follows:

3

- 2 -

Article 1

Scope of Assistance

1. The Contracting Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, in connection with the investigation, prosecution, and prevention of offenses. The Contracting Parties shall also provide such assistance for forfeiture and other proceedings directly related to criminal offenses, where such assistance is not prohibited by the laws of the Requested State.

2. Assistance shall include:

    a) taking the testimony or statements of persons;

    b) providing documents, records, and articles of evidence;

    c) locating or identifying persons or items;

    d) serving documents;

    e) transferring persons in custody for testimony or other purposes;

    f) executing requests for searches and seizures;

    g) assisting in proceedings related to immobilization and forfeiture of assets, restitution to the victims of crime, collection of fines; and

    h) any other form of assistance not prohibited by the laws of the Requested State.

3. Assistance shall be provided without regard to whether the conduct that is the subject of the investigation, prosecution, or proceeding in the Requesting State would constitute an offense under the laws of the Requested State.

4. This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

4

- 3 -

## Article 2
### Central Authorities

1. Each Contracting Party shall have a Central Authority to make and receive requests pursuant to this Treaty.

2. For the United States of America, the Central Authority shall be the Attorney General or a person designated by the Attorney General. For the Republic of Poland, the Central Authority shall be the Minister of Justice - Attorney General or a person designated by the Minister of Justice - Attorney General.

3. The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

## Article 3
### Limitations on Assistance

1. The Central Authority of the Requested State may deny assistance if:

   a) the request relates to an offense under military law that would not be an offense under ordinary criminal law;

   b) the request relates to a political offense;

   c) the execution of the request would prejudice the security or similar essential interests of the Requested State; or

   d) the request is not made in conformity with the Treaty.

2. Before denying assistance pursuant to this Article, the Central Authorities shall consult to consider whether assistance can be given subject to such conditions as the Central Authority of the Requested State deems necessary. If the Requesting State accepts assistance subject to these conditions, it shall comply with the conditions.

3. If the Central Authority of the Requested State denies assistance, it shall inform the Central Authority of the Requesting State of the reasons for the denial.

- 4 -

Article 4

Form and Contents of Requests

1. A request for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in emergency situations. In any such case, the request shall be confirmed in writing within ten days thereafter unless the Central Authority of the Requested State agrees otherwise. The request shall be in the language of the Requested State unless otherwise agreed.

2. The request shall include the following:

    a) the name of the authority conducting the investigation, prosecution, or proceeding to which the request relates;

    b) information describing the facts of the offenses and the procedural history of the case;

    c) the text of the laws describing the offenses for which assistance is requested;

    d) a description of the evidence, information, or other assistance sought; and

    e) a statement of the purpose for which the evidence, information, or other assistance is sought.

3. To the extent necessary and possible, a request shall also include:

    a) information on the identity and location of any person who is to provide testimony or evidence;

    b) information on the identity and location of a person to be served, that person's status in the case, and the manner in which service is to be made;

    c) information on the identity and whereabouts of persons or items to be located;

    d) a precise description of the place or person to be searched and of the items to be seized;

6

- 5 -

e)   a description of the manner in which any testimony or statement is to be taken and recorded;

f)   a list of questions to be asked of a person from whom testimony or a statement is sought;

g)   a description of any particular procedure to be followed in executing the request;

h)   information as to the allowances and expenses to which a person asked to appear in the Requesting State will be entitled; and

i)   any other information that may assist the Requested State in executing the request.

Article 5

Execution of Requests

1.  The Central Authority of the Requested State shall promptly execute the request or, when appropriate, shall transmit it to the authority having jurisdiction to do so. The competent authorities of the Requested State shall do everything in their power to execute the request. The judicial or other competent authorities of the Requested State shall issue subpoenas, search warrants, or other orders necessary to execute the request.

2.  The Central Authority of the Requested State shall make all necessary arrangements for the representation in the Requested State of the Requesting State in any proceedings arising out of a request for assistance.

3.  Requests shall be executed in accordance with the laws of the Requested State except to the extent that this Treaty provides otherwise. However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested State.

4.  If the Central Authority of the Requested State determines that execution of a request would interfere with an ongoing criminal investigation, prosecution, or

- 6 -

proceeding in that State, it may postpone execution, or make execution subject to conditions determined necessary after consultations with the Central Authority of the Requesting State. If the Requesting State accepts the assistance subject to the conditions, it shall comply with the conditions.

5. The Requested State shall use its best efforts to keep confidential a request and its contents if such confidentiality is requested by the Central Authority of the Requesting State. If the request cannot be executed without breaching such confidentiality, the Central Authority of the Requested State shall so inform the Central Authority of the Requesting State, which shall then determine whether the request should nevertheless be executed.

6. The Central Authority of the Requested State shall respond to reasonable inquiries by the Central Authority of the Requesting State on progress toward execution of the request.

7. The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the outcome of the execution of the request. If the request is delayed or postponed, the Central Authority of the Requested State shall inform the Central Authority of the Requesting State of the reasons for the delay or postponement.

Article 6

Costs

The Requested State shall pay all costs relating to the execution of a request, except for the following:

a)   the fees of experts;

b)   the costs of interpretation and translation;

c)   the costs of recording by private parties of testimony or statements, or the costs of preparation by private parties of written records or videotapes of testimony or statements; and

8

- 7 -

d)   the allowances and expenses related to travel of persons travelling to a place in the Requested State as requested by the Requesting State, or pursuant to Article 10 or Article 11.

Article 7

Limitations on Use

1. The Central Authority of the Requested State may request that the Requesting State not use any information or evidence obtained under this Treaty in any investigation, prosecution, or proceeding other than that described in the request without the prior consent of the Central Authority of the Requested State. In such cases, the Requesting State shall comply with this condition.

2. The Central Authority of the Requested State may request that information or evidence furnished under this Treaty be kept confidential or be used only subject to terms and conditions it may specify. If the Requesting State accepts the information or evidence subject to such conditions, the Requesting State shall use its best efforts to comply with the conditions.

3. Nothing in this Article shall preclude the use or disclosure of information to the extent that such information is exculpatory to a defendant in a criminal prosecution. The Requesting State shall notify the Requested State in advance of any such proposed disclosure.

4. Information or evidence which has been made public in the Requesting State in a manner consistent with paragraph 1 or 2 may thereafter be used for any purpose.

Case 1:19-mc-00010-RMS SEALED Document 12-2 Filed 08/10/18 Page 40 of 46

- 8 -

### Article 8

### Testimony or Evidence in the Requested State

1. A person in the Requested State from whom testimony or evidence is requested pursuant to this Treaty shall be compelled, if necessary, to appear and testify or produce items, including documents, records, and articles of evidence. A person who gives false testimony, either orally or in writing, in execution of a request, shall be subject to prosecution and punishment in the Requested State in accordance with the criminal laws of that State, regardless of whether the person would also be subject to prosecution and punishment in the Requesting State.

2. Upon request, the Central Authority of the Requested State shall furnish information in advance about the date and place of the taking of the testimony or evidence pursuant to this Article.

3. The Requested State shall permit the presence of such persons as specified in the request during the execution of the request, and shall allow such persons to question the person giving the testimony or evidence.

4. If the person referred to in paragraph 1 invokes a right to decline to provide testimony or evidence under the laws of the Requesting State, the testimony or evidence shall nonetheless be taken as requested. Thereafter the Central Authority of the Requested State shall transmit the testimony or evidence, together with the asserted claim, for resolution by the competent authorities of the Requesting State.

5. Evidence produced in the Requested State pursuant to this Article or that is the subject of testimony taken under this Article shall, upon request, be authenticated by an attestation, including, in the case of business records, authentication in the manner indicated in Form A appended to this Treaty. The absence or nonexistence of such records shall, upon request, be certified through the use of Form B appended to this Treaty. Records authenticated by Form A, or Form B certifying the absence or nonexistence of such records, shall be admissible in evidence in the Requesting State as proof of the truth of the matters set forth therein.

10

- 9 -

### Article 9

#### Official Documents and Records of Government Agencies

1. The Requested State shall provide the Requesting State with copies of documents, records, or information in any form that are available to members of the public of the Requested State generally or upon compliance with a legal requirement and are in the possession of an executive, legislative, or judicial authority in the Requested State.

2. The Requested State may provide copies of any documents, records, or information in any form that are in the possession of an executive, legislative, or judicial authority in that State, but that are not publicly available, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities. The Requested State may in its discretion deny a request pursuant to this paragraph entirely or in part.

3. Records of an executive, legislative, or judicial authority produced pursuant to this Article shall, upon request, be authenticated by an official responsible for maintaining them through the use of Form C appended to this Treaty. The absence or nonexistence of such records shall, upon request, be certified through the use of Form D appended to this Treaty. Records authenticated by Form C, or Form D certifying the absence or nonexistence of such records, shall be admissible in evidence in the Requesting State as proof of the truth of the matters set forth therein.

### Article 10

#### Appearance in the Requesting State

1. When the Requesting State requests the appearance of a person in that State, the Requested State shall invite the person to appear before the appropriate authority in the Requesting State. The Requesting State shall indicate the extent to which the person's

11

- 10 -

expenses will be paid. The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the person's response.

2. A person appearing in the Requesting State shall not be prosecuted, detained, or subjected to any restriction of personal liberty in the Requesting State by reason of acts or convictions that preceded that person's departure from the Requested State.

3. The safe conduct provided for by this Article shall cease fifteen consecutive days from the date when the person's presence is no longer required, and that person, having had an opportunity to leave, has nevertheless remained in the Requesting State, or, having left, has returned.

Article 11

Temporary Transfer of Persons in Custody

1. A person in the custody of the Requested State whose presence in the Requesting State is sought for purposes of assistance under this Treaty shall be transferred temporarily from the Requested State to the Requesting State for that purpose if the person consents and if the Central Authorities of both States agree.

2. A person in the custody of the Requesting State whose presence in the Requested State is sought for purposes of assistance under this Treaty shall be transferred temporarily from the Requesting State to the Requested State if the person consents and if the Central Authorities of both States agree.

3. For purposes of this Article:

a)    the receiving State shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending State;

b)    the receiving State shall return the person transferred to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both Central Authorities;

- 11 -

   c)  the receiving State shall not require the sending State to initiate extradition or any other proceedings for the return of the person transferred; and

   d)  the person transferred shall receive credit for service of the sentence imposed in the sending State for time served in the custody of the receiving State.

### Article 12
#### Location or Identification of Persons or Items

If the Requesting State seeks the location or identity of persons or items in the Requested State, the Requested State shall use its best efforts to ascertain the location or identity.

### Article 13
#### Service of Documents

1. The Requested State shall use its best efforts to effect service of any document relating to any request for assistance made by the Requesting State under the provisions of this Treaty.

2. The Requesting State shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting State a reasonable time before the scheduled appearance.

3. The Requested State shall return a proof of service to the Requesting State in the manner specified in the Request.

13

- 12 -

### Article 14
### Search and Seizure

1. The Requested State shall execute a request for the search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State.

2. Upon request by the Central Authority of the Requesting State, every official in the Requested State who has had custody of a seized item shall certify, through the use of Form E appended to this Treaty, the identity of the item, the continuity of its custody, and any changes in its condition. No further certification shall be required. The certificates shall be admissible in evidence in the Requesting State as proof of the truth of the matters set forth therein.

3. The Central Authority of the Requested State may require that the Requesting State agree to the terms and conditions deemed necessary by the Central Authority of the Requested State to protect third party interests in the item to be transferred.

### Article 15
### Return of Items

The Central Authority of the Requested State may require that the Central Authority of the Requesting State return as soon as possible any items, including documents, records, or articles of evidence furnished to it in execution of a request under this Treaty.

### Article 16
### Assistance in Forfeiture Proceedings

1. If the Central Authority of one Contracting Party becomes aware of proceeds or instrumentalities of offenses that are located in the other Party and may be forfeitable or

- 13 -

at least subject to immobilization under the laws of the other Party, it may so inform the Central Authority of the other Party. If the other Party has jurisdiction in this regard, it may present this information to its authorities for a determination whether any action is appropriate. These authorities shall issue their decision in accordance with the laws of their country, and shall, through their Central Authority, report on the action taken to the other Party that provided the initial information.

2. The Contracting Parties shall assist each other to the extent permitted by their respective laws in proceedings relating to the forfeiture of the proceeds and instrumentalities of offenses, as well as in proceedings relating to restitution to the victims of crime and the collection of fines imposed as sentences in criminal prosecutions. This may include action to temporarily immobilize the proceeds or instrumentalities pending further proceedings.

3. The Party that has custody over proceeds or instrumentalities of offenses shall dispose of them in accordance with its laws. Either Party may transfer all or part of such assets, or the proceeds of their sale, to the other Party, to the extent permitted by the transferring Party's laws and upon such terms as it deems appropriate.

Article 17

Compatibility with Other Treaties

Assistance and procedures set forth in this Treaty shall not prevent either of the Contracting Parties from granting assistance to the other Party through the provisions of other applicable international agreements. The Parties may also provide assistance pursuant to established practices in a manner consistent with their laws.

15

- 14 -

### Article 18
### Consultation

The Central Authorities of the Contracting Parties shall consult, at times mutually agreed to by them, to promote the most effective use of this Treaty. The Central Authorities may also agree on such practical measures as may be necessary to facilitate the implementation of this Treaty.

### Article 19
### Ratification, Entry Into Force, and Termination

1. This Treaty shall be subject to ratification, and the instruments of ratification shall be exchanged at Warsaw as soon as possible.

2. This Treaty shall enter into force 30 days after the exchange of instruments of ratification.

3. Either Contracting Party may terminate this Treaty at any time by giving written notice to the other Contracting Party, and the termination shall be effective six months after the date of the receipt of such notice.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE at Washington, this tenth day of July, 1996, in duplicate, in the English and Polish languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA:     FOR THE REPUBLIC OF POLAND: